IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 20-40349-elm11** |
| | ) | |
| EVENTIDE CREDIT | ) | Fort Worth, Texas |
| ACQUISITIONS, LLC, | ) | June 9, 2020 |
| | ) | 9:30 a.m. Docket |
| Debtor. | ) | |
| | ) | RENDER RULING - CONSUMER |
| | ) | BORROWERS' MOTION FOR AN ORDER |
| | ) | DISMISSING THE DEBTOR'S |
| | ) | CHAPTER 11 CASE OR, IN THE |
| | ) | ALTERNATIVE, FOR ABSTENTION |
| | ) | (#123) |
| ———————————————————— | ) | |
| | ) | |
| EVENTIDE CREDIT | ) | **Adversary Proceeding 20-4008-elm** |
| ACQUISITIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | RENDER RULING - CONSUMER |
| | ) | BORROWERS' MOTION TO DISMISS |
| v. | ) | (#82) |
| | ) | |
| GALLOWAY, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| EVENTIDE CREDIT | ) | **Adversary Proceeding 20-4030-elm** |
| ACQUISITIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | RENDER RULING - MOTION TO |
| | ) | DISMISS ADVERSARY PROCEEDING |
| v. | ) | FOR LACK OF SUBJECT MATTER |
| | ) | JURISDICTION (#18) |
| BIG PICTURE LOANS, LLC; | ) | |
| ASCENSION TECHNOLOGIES, | ) | |
| LLC; AND TRIBAL ECONOMIC | ) | |
| DEVELOPMENT HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE.

```
 1   TELEPHONIC APPEARANCES:

 2   For the Debtor-Plaintiff:   Bethany D. Simmons
                                 LOEB & LOEB, LLP
 3                               345 Park Avenue
                                 New York, NY  10154
 4                               (212) 407-4982

 5   For the Debtor-Plaintiff:   Jeff P. Prostok
                                 FORSHEY & PROSTOK, LLP
 6                               777 Main Street, Suite 1290
                                 Fort Worth, TX  76102
 7                               (817) 877-8855

 8   For Ascension Technologies, Toby L. Gerber
     LLC; Big Picture Loans,     Steve A. Peirce
 9   LLC; and Tribal Economic    Scott Drake
     Development Holdings, LLC:  Nick Hendrix
10                               Norton Rose Fulbright US LLP
                                 2200 Ross Avenue, Suite 3600
11                               Dallas, TX  75201
                                 (214) 855-7171
12
     For Ascension Technologies, Justin Gray
13   LLC: Big Picture Loans,     Anna Bruty
     LLC: and Tribal Economic    ROSETTE, LLP
14   Development Holdings, LLC:  44 Grandville Avenue SW
                                 Grand Rapids, MI  49503
15                               (616) 655-1601

16   For the Consumer            James Paul Muenker
     Borrower Defendants:        Patrick J. Neligan, Jr.
17                               NELIGAN FOLEY, LLP
                                 325 N. St. Paul, Suite 3600
18                               Dallas, TX  75201
                                 (214) 840-5340
19
     For the Consumer            Leonard Anthony Bennett
20   Borrowers:                  CONSUMER LITIGATION ASSOCIATES
                                 763 J. Clyde Morris Blvd.,
21                                  Suite 1A
                                 Newport News, VA  23601
22                               (757) 930-3660

23   For the Consumer            Michael Allen Caddell
     Borrowers:                  CADDELL & CHAPMAN
24                               628 East 9th Street
                                 Houston, TX  77007
25                               (713) 751-0400
```

```
TELEPHONIC APPEARANCES, cont'd.:

For the United States        Erin Marie Schmidt
Trustee:                     OFFICE OF THE UNITED STATES
                                 TRUSTEE
                             1100 Commerce Street, Room 976
                             Dallas, TX  75242-1496
                             (214) 767-1075

For the Official Committee   Gary Howard Leibowitz
of Unsecured Creditors:      Irving E. Walker
                             Harry "H.C." Jones III
                             COLE SCHOTZ P.C.
                             300 E. Lombard Street, Suite 1450
                             Baltimore, MD  21202
                             (410) 528-2971

For Matt Martorello,         Robin Eric Phelan
Creditor:                    ROBIN PHELAN LAW
                             4214 Woodfin Drive
                             Dallas, TX  75220
                             (214) 704-0222

Recorded by:                 Melissa Hurtado
                             UNITED STATES BANKRUPTCY COURT
                             501 W. 10th Street
                             Fort Worth, TX  76102
                             (817) 333-6039

Transcribed by:              Kathy Rehling
                             Transcription Service
                             311 Paradise Cove
                             Shady Shores, TX  76208
                             (972) 786-3014
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

| | |
|---|---|
| 1 | FORT WORTH, TEXAS - JUNE 9, 2020 - 9:32 A.M. |
| 2 | THE COURT:  All right.  Good morning, everybody. |
| 3 | We're on the June 9, 2020 9:30 a.m. docket.  We have the |
| 4 | Eventide Credit Acquisitions, LLC case, Case 20-40349; the |
| 5 | Eventide Credit Acquisitions, LLC versus Galloway, et al. |
| 6 | case, Adversary No. 20-4008; and the Eventide Credit |
| 7 | Acquisitions, LLC versus Big Picture Loans, et al. case, |
| 8 | Adversary No. 20-4030. |
| 9 | Even though this is for purposes of rendering a ruling on |
| 10 | a number of matters, let me go ahead and at least entertain |
| 11 | the opportunity for appearances for counsel that wish to make |
| 12 | them.  Let me start with counsel for the Debtor. |
| 13 | MR. PROSTOK:  Good morning, Your Honor.  Jeff Prostok |
| 14 | for the Debtor. |
| 15 | THE COURT:  All right.  Good morning, Mr. Prostok. |
| 16 | MS. SIMMONS:  Good morning, Your Honor.  Bethany |
| 17 | Simmons; Loeb & Loeb, LLP; for the Debtor as well. |
| 18 | THE COURT:  All right.  Good morning to you.  All |
| 19 | right.  Do I have anybody on behalf of the Consumer Borrower |
| 20 | Group? |
| 21 | MR. MUENKER:  Good morning, Your Honor.  James |
| 22 | Muenker and Pat Neligan for the Consumer Borrowers. |
| 23 | THE COURT:  All right.  Good morning to both of you. |
| 24 | MR. CADDELL:  Good morning, Your Honor.  Mike Caddell |
| 25 | for the Consumer Borrowers. |

1          THE COURT:  All right.  Good morning.  Do we have

2   anybody else?

3          MR. BENNETT:  Good morning, Judge.  This is --

4          THE COURT:  Go ahead.

5          MR. BENNETT:  Yes, sir.  This is Leonard Bennett for

6   the Consumer Borrowers, Judge.

7          THE COURT:  All right.  Any additional appearances on

8   behalf of the Consumer Borrowers?

9       All right.  How about for the -- what we've commonly

10  referred to as the Tribal Defendants:  Big Picture Loans,

11  Ascension Technologies, and Tribal Economic Development

12  Holdings?

13         MR. DRAKE:  Good morning, Your Honor.  This is Scott

14  Drake from Norton Rose Fulbright.  I have my colleagues Toby

15  Gerber and Steve Peirce, and also our co-counsel from the

16  Rosette firm, Justin Gray and Anna Bruty.

17         THE COURT:  All right.  Good morning to all of you.

18  How about for the Committee?

19         MR. LEIBOWITZ:  Good morning, Your Honor.  Gary

20  Leibowitz of Cole Schotz on behalf of the Committee.  And I

21  have my colleagues Irving Walker and H.C. Jones on as well.

22         THE COURT:  Good morning to you all.  And then how

23  about for Matt Martorello?

24         MR. PHELAN:  Your Honor, Robin Phelan for Matt

25  Martorello.

1          THE COURT:  All right.  Do we have any other counsel

2    that wish to make a live appearance for today's proceeding?

3          MS. SCHMIDT:  Good morning, Your Honor.  Erin Schmidt

4    for the U.S. Trustee.

5          THE COURT:  Good morning, Ms. Schmidt.

6          MS. SCHMIDT:  Thank you.

7          THE COURT:  All right.  Any other parties?

8      All right.  Very good.

9      Before the Court for determination are four motions:  two

10   in the main Bankruptcy Case, Case No. 20-40349, which I'll

11   simply refer to as the "Bankruptcy Case," one in Adversary

12   Proceeding No. 20-4008, which I'll refer to as "Adversary

13   4008," and one in Adversary Proceeding No. 20-4030, which

14   I'll refer to as "Adversary 4030."

15     Specifically before the Court in the Bankruptcy Case are

16   the following motions.  First, there is a motion for an order

17   dismissing the Debtor's Chapter 11 case, or in the

18   alternative, for abstention, filed at Docket #123 by a group

19   of 34 individuals who collectively refer to themselves as the

20   "Consumer Borrowers."  I'll refer to this motion as the

21   "Bankruptcy Dismissal Motion" and refer to this group of

22   Movants as the "Consumer Borrowers."

23     Both Eventide Credit Acquisitions, LLC, or the "Debtor"

24   for short, the Chapter 11 Debtor in the Bankruptcy Case, and

25   Matt Martorello, or "Martorello" for short, the Debtor's

1  president and a significant indirect equity owner of the

2  Debtor, have filed a response in opposition to the Bankruptcy

3  Dismissal Motion, the Debtor's response at Docket #148 and

4  Martorello's response at Docket #149.

5      The Official Committee of Unsecured Creditors, or the

6  "Committee" for short, has filed a Memorandum in Support of

7  the Bankruptcy Dismissal Motion at Docket #151, to which

8  Martorello has filed a response at Docket #172.

9      Finally, the Consumer Borrowers have filed a reply to the

10 responses in opposition to the Bankruptcy Dismissal Motion at

11 Docket #177.

12     The Bankruptcy Dismissal Motion was heard by the Court on

13 May 28, 2020.

14     Second, there is a Motion for Entry of Interim and Final

15 Orders pursuant to 11 U.S.C. Sections 105, 362, 363, 364, and

16 507, Bankruptcy Rules 2002, 4001, 6004, and 9014:  (1)

17 authorizing the Debtor-in-Possession to obtain postpetition

18 financing; (2) granting liens and providing administrative

19 expense status; and (3) granting related relief, filed at

20 Docket #153 by the Debtor, as supplemented by the Notice of

21 Filing of Proposed Amended and Restated Debtor-in-Possession

22 Financing and Security Agreement filed at Docket #181.  I'll

23 refer to this motion, as supplemented, as the "Financing

24 Motion."

25     Both the Committee and the Consumer Borrowers have filed

1  an objection to the Financing Motion, the Committee's

2  objection at Docket #168 and the Consumer Borrowers'

3  objection at Docket #207.

4      The Financing Motion was heard by the Court on May 29,

5  2020.

6      Third, in Adversary 4008, there is the Motion to Dismiss

7  filed at Docket #82 in Adversary 4008 by the Consumer

8  Borrowers, who are all of the remaining defendants in the

9  action.  I'll refer to this motion, along with the Consumer

10 Borrowers' Memorandum in Support at Docket #83 in Adversary

11 4008, as the "Adversary 4008 Dismissal Motion."

12     The Debtor has filed its objection to the motion at

13 Docket #86 in Adversary 4008.  The Consumer Borrowers have

14 filed their reply at Docket #93 in Adversary 4008.

15     The Adversary 4008 Dismissal Motion was heard by the

16 Court on May 28, 2020.

17     Finally, in Adversary 4030, there is the Specially-

18 Appearing Tribal Defendants' Motion to Dismiss for Lack of

19 Subject Matter Jurisdiction filed at Docket #18 in Adversary

20 4030 by the Defendants Tribal Economic Development Holdings,

21 LLC, or "TED" for short; Big Picture Loans, LLC, or "Big

22 Picture" for short; and Ascension Technologies, LLC, or

23 "Ascension" for short, and together with TED and Big Picture,

24 collectively referred to as the Tribal Defendants.  I'll

25 refer to this motion along with the Tribal Defendants' brief

and appendix in support filed at Docket #19 and #21 in

Adversary 4030, respectively, as the "Adversary 4030

Dismissal Motion."

The Debtor has filed its objection to the motion at

Docket #26 in Adversary 4030.  The Tribal Defendants have

filed their reply at Docket #29 in Adversary 4030.

The Adversary 4030 Dismissal Motion was heard by the

Court on June 4, 2020.

Having now considered the Bankruptcy Dismissal Motion,

the Financing Motion, the Adversary 4008 Dismissal Motion,

the Adversary 4030 Dismissal Motion, the respective

previously-referenced responses, statements of position,

objections and replies, as applicable to each of the

aforementioned motions, the evidence introduced at the

hearings conducted on May 28th and 29th and June 4th, 2020,

the arguments of counsel, and all prior proceedings before

the Court in the Bankruptcy Case, Adversary 4008, and

Adversary 4030, the Court now issues its findings and

conclusions as applicable in relation to the Bankruptcy

Dismissal Motion, Financing Motion, Adversary 4008 Dismissal

Motion, and Adversary 4030 Dismissal Motion.

Starting with the Bankruptcy Dismissal Motion, in

particular, and Jurisdiction.  The Court has jurisdiction

over the Bankruptcy Dismissal Motion pursuant to 28 U.S.C.

Sections 1334 and 157 and the order of reference of the

1 United States District Court for the Northern District of

2 Texas.  Venue is proper in this district pursuant to 28

3 U.S.C. Sections 1408 and 1409.  The proceeding constitutes a

4 core proceeding within the meaning of 28 U.S.C. Section

5 157(b)(2)(A) and (O).

6     Factual Background.  In one way or another, each of the

7 matters pending before the Court relates to litigation that

8 was initiated by or against the Debtor or parties affiliated

9 with the Debtor prior to the Debtor's Chapter 11 bankruptcy

10 filing on January 28, 2020.  Therefore, it is helpful to

11 understand the background and nature of each of the parties

12 involved in the disputes before the Court in order to equally

13 understand the context in which the prepetition litigation

14 arose.

15     A.  Martorello, Bellicose, and the Business Relationship

16 Established with the LVD Tribe.

17     Martorello, being the ultimate architect of the business

18 that led to organization of the Debtor, has a strong

19 financial background.  He is a graduate of the University of

20 Illinois with a double major in finance and accounting.

21 Following graduation, he started his career in institutional

22 corporate bond sales with Smith Barney in its investment

23 banking analyst program.

24     After a couple of years with Smith Barney, he worked for

25 a few different proprietary trading firms, and thereafter he

1    rejoined a group of folks with whom he had interned at Arthur

2    Anderson who had moved to the transaction services group of

3    KPMG.  During his roughly two-year stint at KPMG, Martorello

4    worked on a variety of transaction services projects, mainly

5    around asset-based lending, private equity buyouts, and

6    mergers and acquisitions.

7         In or around 2008, however, Martorello decided to shift

8    gears and transition from a service provider within the

9    financial services industry to a business owner/entrepreneur

10   within the industry.  In particular, having learned of the

11   success that certain of his investment banker colleagues had

12   had in putting together a consumer lending business that was

13   eventually bought out, Martorello leveraged his own

14   experience in the financial field in developing an online

15   consumer lending business focused on servicing operations

16   that utilized the same type of artificial intelligence and

17   algorithm creation strategies that he had been exposed to in

18   securities trading.  Ultimately, this culminated in the

19   creation of a business named aPriori Solutions in Chicago.

20        In mid-2011, Martorello sought to capitalize on a tax

21   incentive program offered in the U.S. Virgin Islands and

22   effectively reconstituted the aPriori Solutions business

23   within a new Virgin Islands entity named Bellicose VI, Inc.,

24   or "Bellicose VI" for short.

25        Following the organization of Bellicose VI, the Lac Vieux

1   Desert Band of Lake Superior Chippewa Indians, or the "Tribe"

2   for short, with the assistance and guidance of Bellicose VI,

3   began to conduct an online lending business through its

4   wholly-owned subsidiary, Red Rock Tribal Lending, LLC, or

5   "Red Rock" for short.

6       In this regard, on or about October 25, 2011, Bellicose

7   VI and Red Rock entered into a servicing agreement.  *See*

8   Consumer Borrowers' May 28 Hearing Exhibit 1.

9       As reflected by the servicing agreement, Red Rock had the

10  exclusive right at that time to "develop and operate the

11  Tribe's financial services business that will provide small-

12  denomination short-term financial services and other related

13  goods and services to consumers through its Internet call

14  center and field representative operations."  *See id.*,

15  Section 1.2.2.

16      It was the Tribe's intention, through Red Rock, to

17  "engage in Internet-based unsecured lending."  *See id.*,

18  Section 1.2.3.

19      Thus, with this in mind, pursuant to the services

20  agreement, Red Rock sought to "retain and engage the

21  Servicer" -- defined as Bellicose VI -- "as its independent

22  contractor to consult to, develop, manage, and provide

23  operational guidelines regarding the unsecured lending

24  business and any expansion thereof."

25      The term of the agreement was until the end of 2018, with

1    the opportunity for renewal.

2         The Tribe subsequently also offered consumer loans

3    through a second subsidiary named Duck Creek Financial, LLC,

4    or "Duck Creek" for short.  Duck Creek also entered into a

5    servicing agreement with Bellicose VI.

6         Bellicose VI would eventually enter into other business

7    opportunities as well, organizing separate subsidiaries to

8    carry on each particular business.  For example, it had a

9    proprietary trading subsidiary, a subsidiary that provided

10   financing to a casino boat, and a subsidiary that did a salt

11   lease deal with a travel casino.

12        In the case of the business that it conducted with the

13   Tribe and its subsidiaries, in 2012, Bellicose VI organized

14   SourcePoint VI, LLC, or "SourcePoint" for short, to carry on

15   the business, and assigned all of its rights under the

16   servicing agreements with Red Rock and Duck Creek to

17   SourcePoint.

18        In or around mid-2013, the New York State Department of

19   Financial Services, or the "NYDFS," began to take enforcement

20   actions against various tribal entities, including the Tribe

21   and its subsidiaries, to prevent what it asserted as

22   impermissible usurious consumer lending.  This led to the

23   initiation of litigation by the Tribe and a number of other

24   tribal entities against the NYDFS and its Superintendent in

25   August 2013 to try to prevent their interference with tribal

lending operations, which the tribal entities asserted were not subject to New York's lending laws and regulations.  *See generally* Civil Action No. 1:13-CV-05930-RJS, in the United States District Court for the Southern District of New York.

Their request for preliminary injunctive relief was denied by the District Court in September 2013, and the order denying relief was subsequently upheld on appeal.

Having encountered this potential impediment to the online lending business, the Tribe, Martorello, and other owners of Bellicose VI began to explore the possibility of the Tribe's acquisition of Bellicose VI and SourcePoint so as to bring in-house all aspects of the lending business.

With the buyout potential in play, in January 2014, the Martorello team made another change in location, this time to Puerto Rico, in order to obtain the benefit of the capital gains tax exemption available to residents of Puerto Rico. Bellicose Capital, LLC, or "Bellicose Capital" for short, was then organized as the new parent holding company of Bellicose VI.

B.  Organization, Ownership, and Prepetition Control of the Debtor.

Thereafter, on February 9, 2015, the Debtor was organized as a Delaware limited liability company for the purpose of serving as the special-purpose vehicle through which consideration for the sale would be received.  *See* Consumer

Borrowers' May 28 Hearing Exhibit 9.

     With respect to ownership of the Debtor, the economic and
equity interest membership interests in the Debtor, being the
financial membership interests in the Debtor, were issued as
follows:  59.5 percent to Kairos Holding, LLC, which later
became Breakwater Holding, LLC, so I'll simply refer to this
entity as "Breakwater;" 25.5 percent to Gallant Capital, LLC,
or "Gallant" for short; 10 percent to Martorello's brother,
Justin Martorello, who I'll refer to as "Justin;" and the
remaining 5 percent split up among Brian McFadden, James
Dowd, and Simon Liang, who I'll collectively refer to as the
"Settling Eventide Members."  *See id.*, Schedule A.  *See also*
Consumer Borrowers' May 28 Hearing Exhibit 22.

     Providing further color to the Debtor's ownership
structure, both Gallant and Breakwater have connections to
Martorello.  First, in the case of Gallant, the 25.5 percent
owner of the Debtor, Martorello acknowledged that he is its
majority owner and he signed the proof of claim filed by
Gallant in the Bankruptcy Case as its Manager.  *See* Consumer
Borrowers' May 28 Hearing Exhibit 27.

     Second, in the case of Breakwater, the 59.5 percent owner
of the Debtor, Breakwater is a Cook Islands limited liability
company wholly-owned by the Bluetech Irrevocable Trust,
formerly known as the M. Martorello Irrevocable Trust, which
I'll refer to as "Bluetech" or the "Bluetech Trust" for

1   short.

2        Pursuant to the terms of the trust instrument governing

3   the Bluetech Trust, the Trust Fund committed to the Trust is

4   administered by a trustee for the benefit of so-called

5   Discretionary Beneficiaries who have been identified on a

6   schedule to the instrument, and any additional Discretionary

7   Beneficiaries who the Protector of the Bluetech Trust may

8   nominate, provided they are not Excluded Persons.  *See*

9   Committee's May 28 Hearing Exhibit 13.

10       Martorello acknowledged that he is both the Settlor and

11  the Protector of the Bluetech Trust, and that the current

12  Discretionary Beneficiaries are his family members.  Excluded

13  Persons include, among others, all court, administrative, or

14  judicial bodies, except for the court, administrative, or

15  judicial bodies organized and empowered under the laws of the

16  Cook Islands, and any and all creditors, claimants, and

17  judgment creditors of, among others, any Settlor or any

18  Discretionary Beneficiary.  *See id.*

19       With respect to management and control of the Debtor, the

20  operating agreement of the Debtor provides that the business

21  and affairs of the company shall be managed by or under the

22  direction of a Manager who may exercise all powers of the

23  company and do all such lawful acts and things as are not, by

24  statute, the certificate of formation, or the operating

25  agreement, directed or required to be exercised and done by

1   the members having a right to vote.  *See* Consumer Borrowers'

2   May 28 Hearing Exhibit 9.

3        (Proceedings interrupted by power surge, 9:52 a.m. to

4   9:55 a.m.)

5             THE COURT:  All right.  Can anybody hear us?

6        (Chorus of assents.)

7             THE COURT:  Let me just do a quick roll call.  Do we

8   have counsel for the Debtor?

9             MS. SIMMONS:  Yes, Your Honor.

10            THE COURT:  All right.  Do we have counsel for the

11  Consumer Borrower Group?

12            MR. BENNETT:  Yes, Your Honor.

13            THE COURT:  All right.  Counsel for the Tribal

14  Defendants?

15            MR. DRAKE:  We're here, Your Honor.

16            THE COURT:  Counsel for the Committee?

17            MR. LEIBOWITZ:  We're here, Your Honor.

18            THE COURT:  Counsel for Mr. Martorello?

19            MR. PHELAN:  We're here, Your Honor.

20            THE COURT:  All right.  And I feel like I'm

21  forgetting somebody.

22            MS. SCHMIDT:  Erin Schmidt for the U.S. Trustee is

23  still on the line.

24            THE COURT:  Ah, yes, Ms. Schmidt.  That's it.  All

25  right.  So, --

1          MR. PHELAN:  I didn't hear Mr. Prostok.

2          THE COURT:  Okay.  Do we have -- do we have Mr.

3  Prostok?

4       (No response.)

5       MS. SIMMONS:  Your Honor, this is Bethany Simmons

6  from Loeb & Loeb also on behalf of the Debtor.  I just

7  emailed Mr. Prostok to see if he was still on or able to

8  rejoin.

9       (Court confers with Clerk.)

10          THE COURT:  Okay.  And I'm sorry.  It's Ms. Simmons,

11  right?

12          MS. SIMMONS:   (garbled)

13          THE COURT:  I just didn't hear you completely.  Did

14  you send a note, did you say, to Mr. Prostok to try to dial

15  back in?

16          MS. SIMMONS:  Yes, Your Honor.  I sent him a note

17  just to tell him that we were back on and to dial back in.

18          THE COURT:  All right.  Perfect.  We'll give him a

19  second.

20       (Pause, 9:57 a.m. to 9:58 a.m.)

21          THE COURT:  While we're waiting to see if he can

22  rejoin, just so that you all know what happened:  We had a

23  very strange power surge in the building and literally lost

24  all the power in the courtroom and everything, for just a

25  second.  But it literally killed all of our systems.  So, --

1          (Court confers with Clerk.)

2               THE COURT:  We just received a note that Mr. Prostok

3   should be dialing in right now.

4          (Court confers with Clerk.)

5               THE COURT:  Oh.  All right.  We just heard that this

6   was a city-wide matter.

7          All right.  Do we have Mr. Prostok?

8               MR. PROSTOK:  I am here, Your Honor.

9               THE COURT:  All right.  Very good.  I was just

10  explaining:  We apparently had some city-wide surge.  We

11  thought it was just here in the building, but apparently it

12  was city-wide, and it killed our system.  So, now for the

13  trick of trying to figure out where we dropped off.

14              MR. PHELAN:  Your Honor, I think it was right when

15  you said Breakwater was owned by Bluetech, and then you

16  started to talk about the beneficiaries.

17              THE COURT:  All right.  So let's do this.  I'll start

18  here.

19         Providing further color to the Debtor's ownership

20  structure, both Gallant and Breakwater have connections to

21  Martorello.  First, in the case of Gallant, the 25.5 percent

22  owner of the Debtor, Martorello acknowledged that he is its

23  majority owner and he signed the proof of claim filed by

24  Gallant in the Bankruptcy Case as its Manager.  *See* Consumer

25  Borrowers' May 28 Hearing Exhibit 27.

1    Second, in the case of Breakwater, the 59.5 percent owner

2  of the Debtor, Breakwater is a Cook Islands limited liability

3  company wholly-owned by the Bluetech Irrevocable Trust,

4  formerly known as the M. Martorello Irrevocable Trust, which

5  I'll refer to as "Bluetech" or the "Bluetech Trust" for

6  short.

7    Pursuant to the terms of the trust instrument governing

8  the Bluetech Trust, the Trust Fund committed to the Trust is

9  administered by a trustee for the benefit of so-called

10  Discretionary Beneficiaries who have been identified on a

11  schedule to the instrument, and any additional Discretionary

12  Beneficiaries who the Protector of the Bluetech Trust may

13  nominate, provided they are not Excluded Persons.  *See*

14  Committee's May 28 Hearing Exhibit 13.

15    Martorello acknowledged that he is both the Settlor and

16  the Protector of the Bluetech Trust, and that the current

17  Discretionary Beneficiaries are his family members.  Excluded

18  Persons include, among others, all court, administrative, or

19  judicial bodies, except for the court, administrative, or

20  judicial bodies organized and empowered under the laws of the

21  Cook Islands, and any and all creditors, claimants, and

22  judgment creditors of, among others, any Settlor or any

23  Discretionary Beneficiary.  *See id.*

24    With respect to management and control of the Debtor, the

25  operating agreement of the Debtor provides that the business

and affairs of the company shall be managed by or under the

direction of a Manager who may exercise all powers of the

company and do all such lawful things -- I'm sorry, do all

such lawful acts and things as are not, by statute, the

certificate of formation, or the operating agreement,

directed or required to be exercised and done by the members

having a right to vote.  *See* Consumer Borrowers' May 28

Hearing Exhibit 9, Section V.A.

     The Manager, in turn, has the power to appoint and remove

officers.  *See id.*, Section V.B(ii).

     Under the terms of the operating agreement, however, the

Manager can be removed with or without cause by the vote or

written consent in lieu of a meeting of the members holding a

majority of the voting interests of the Debtor.  *See id.*,

Section V.E.

     Thus, ultimately, the Manager may be removed or

overridden at any time by the holder or holders of a majority

of the voting membership interests of the Debtor.  I'll come

back to this in a minute.

     At the time of the Debtor's formation, Liont, LLC, or

"Liont" for short, was appointed as the initial Manager of

the Debtor.  *See id.*, Section V.A.

     Martorello was the president of Liont, and Liont, as the

Manager of the Debtor, appointed Martorello as president of

the Debtor, an officer position that Martorello continues to

1  hold.

2       Later, James Walesa would come to be appointed as Manager

3  of the Debtor, but effective January 16, 2020, he resigned,

4  and on January 17, 2020, Drew McManigle, or "McManigle" for

5  short, was appointed as the new Manager.  *See* Consumer

6  Borrowers' May 28 Hearing Exhibit 26.

7       McManigle is the founder and managing director of MACCO

8  Restructuring Group, LLC, or "MACCO" for short.

9       Circling back to the voting members of the Debtor, at all

10  times one hundred percent of the voting membership interests

11  of the Debtor have been held by Breakwater.  *See* Consumer

12  Borrowers' May 28 Hearing Exhibit 9, Schedule A.

13       Thus, at all times, the Manager has served at the

14  pleasure of and could be overridden by Breakwater.

15       Breakwater is also manager-managed.  Its Manager is ATP

16  Directors Limited, an offshore entity.  *See* Consumer

17  Borrowers' May 28 Hearing Exhibit 21, last page of attached

18  MACCO Restructuring Group engagement letter.

19       Tine Fa'asili Ponia, or "Ponia" for short, is a purported

20  authorized officer of ATP Directors Limited.  Separately,

21  with respect to Bluetech, Breakwater's one hundred percent

22  owner, Bluetech's trustee is Guardian Trust Corporation, a

23  Cook Islands corporation.  Guardian Trust Corporation's

24  officers include the offshore entities ATP Directors Limited

25  and ATP Secretaries Limited.  *See* Committee's May 28 Hearing

1    Exhibit 13 at Page 25.

2        C.  Sale of the Bellicose Servicing Business to the

3    Tribe.

4        Ultimately, the Tribe agreed with the owners of Bellicose

5    Capital to acquire the servicing business of Bellicose

6    Capital by way of a multistep transaction.  First, all of the

7    assets directly or indirectly held by Bellicose Capital

8    unrelated to the business of the Tribe were separated from

9    Bellicose Capital, and the assets of SourcePoint were moved

10   into Bellicose Capital.

11       Then the following documents were executed to effectuate

12   the transaction:  First, an agreement and plan of merger

13   among LVD Tribal Acquisition Company, LLC, or "TAC" for

14   short, as Acquiror, an entity wholly-owned and operated by

15   the Tribe; the Debtor as Seller; and Bellicose Capital as the

16   target company.  *See* Debtor's May 28 Hearing Exhibit 14.  *See*

17   *also* Consumer Borrowers' May 28 Hearing Exhibit 11.

18       Second, a Loan and Security Agreement executed by TED,

19   and together with its Subsidiaries, as defined therein,

20   referred to as Borrower, and the Debtor, as Lender, such

21   agreement referred to as the LSA.  *See* Debtor's May 28

22   Hearing Exhibit 12.

23       Third, a secured promissory note dated January 26, 2016,

24   executed by TED, the wholly-owned subsidiary of the Tribe, in

25   favor of the Debtor, referred to as the "Promissory Note."

1   *See* Debtor's May 28 Hearing Exhibit 11.

2        And fourth, a parental guaranty and sovereign immunity

3   waiver executed by the Debtor as Lender and the Tribe, TED,

4   and all Subsidiaries, as defined therein, including, without

5   limitation, Big Picture and Ascension, such document referred

6   to as the "Guaranty."  *See* Debtor's May 28 Hearing Exhibit

7   13.

8        As a result of the transaction, which, as mentioned,

9   closed on or about January 26, 2016, the lending business

10  previously conducted by Red Rock and Duck Creek was taken

11  over by Big Picture; the servicing business previously

12  conducted by Bellicose VI and SourcePoint was taken over by

13  Ascension; and TED, being the parent holding company of both

14  Big Picture and Ascension, committed to make payments to the

15  Debtor under the terms of the LSA and complex waterfall

16  provisions of the Promissory Note for a period of seven

17  years, secured by the Collateral as defined in the LSA, which

18  consists of, among other things, substantially all of the

19  personal property of the Tribal Defendants.

20       Focusing on the Promissory Note specifically.  The

21  waterfall provisions of the Promissory Note implement what

22  amounts to a net profits interest in the lending operations

23  of Big Picture and Ascension for a period of seven years.  As

24  such, any action taken by Big Picture and/or Ascension that

25  could negatively impact their profitability could conceivably

also negatively impact payments to the Debtor on its *de facto*
net profits interest.  This becomes relevant in later
discussing the settlement agreed upon by the Tribal
Defendants.

D.  The Prepetition Consumer Borrower Litigation and
Tentative Class Action Settlement with the Tribal Entities,
Individuals Affiliated with the Tribal Entities, the Settling
Eventide Members, and Certain Third Parties.

This, then, now takes me to the Consumer Borrowers.
Beginning in June 2017, several actions were commenced
against the Tribe and certain of its subsidiaries -- the
Tribe and such affiliates, as applicable, collectively and
generically referred to as the "Tribal Entities;" various
individuals affiliated with the Tribal Entities; the Debtor,
and various individuals and entities affiliated with the
Debtor, including, without limitation, Martorello.  Briefly,
the actions are as follows:

One, Lula Williams, et al., on behalf of themselves and
all individuals similarly situated versus certain Tribal
Entities, Martorello, and certain individuals affiliated with
the Tribal Entities, Civil Action No. 3:17-CV-461, filed in
the U.S. District Court for the Eastern District of Virginia
on June 22, 2017.  *See* Consumer Borrowers' May 28 Hearing
Exhibit 38; Debtor's May 28 Hearing Exhibit 32.  I'll refer
to this case as the "Williams I Case."

1          Two, Renee Galloway, et al., as individuals and as

2    representatives of the classes versus certain Tribal Entities

3    and Martorello, Civil Action No. 3:18-CV-406, filed in the

4    U.S. District Court for the Eastern District of Virginia on

5    June 11, 2018.  *See* Consumer Borrowers' May 28 Hearing

6    Exhibit 35; Debtor's May 28 Hearing Exhibit 34.  I'll refer

7    to this case as the "Galloway I Case."

8          Three, Richard Lee Smith, Jr., individually and on behalf

9    of persons similarly situated, versus certain Tribal

10   Entities, Martorello, and the Debtor, Civil Action No. 3:18-

11   CV-1651, filed in the U.S. District Court for the District of

12   Oregon on September 11, 2018.  *See* Consumer Borrowers' May 28

13   Hearing Exhibit 43; Debtor's May 28 Hearing Exhibit 36.  I'll

14   refer to this case as the "Smith Case."

15         Four, Dana Duggan, individually and on behalf of persons

16   similarly situated, versus certain Tribal Entities, certain

17   individuals affiliated with the Tribal Entities, Martorello,

18   and the Debtor, Civil Action No. 1:18-CV-12277, filed in the

19   U.S. District Court for the District of Massachusetts on

20   October 31, 2018.  *See* Consumer Borrowers' May 28 Hearing

21   Exhibit 44; Debtor's May 28 Hearing Exhibit 38.  I'll refer

22   to this case as the "Duggan Case."

23         Five, Lula Williams, et al. versus Martorello and certain

24   additional third parties, Civil Action No. 3:19-CV-85, filed

25   in the U.S. District Court for the Eastern District of

Virginia on February 11, 2019.  *See* Debtor's May 28 Hearing

Exhibit 41.  I'll refer to this case as the "Williams II

Case."

Six, Renee Galloway, et al., as individuals and as

representatives of the classes, versus the Debtor, certain

individuals and entities affiliated with the Debtor and

Martorello, and certain additional third parties, Civil

Action No. 3:19-CV-314, filed in the U.S. District Court for

the Eastern District of Virginia on April 24, 2019.  *See*

Consumer Borrowers' May 28 Hearing Exhibit 36; Debtor's May

28 Hearing Exhibit 43.  I'll refer to this case as the

"Galloway II Case."

And seven, Renee Galloway, et al., as individuals and as

representatives of the classes, versus certain individuals

affiliated with the Tribal Entities, Civil Action No. 3:19-

CV-470, filed in the U.S. District Court for the Eastern

District of Virginia on June 26, 2019.  *See* Consumer

Borrowers' May 28 Hearing Exhibit 37.  I'll refer to this

case as the "Galloway III Case."

I'll collectively refer to the Williams I, Galloway I,

Smith, Duggan, Galloway II, and Galloway III Cases as the

"Class Action Cases," and collectively refer to the Class

Action Cases and the Williams II Case as the "Consumer

Borrower Cases."

Of relevance in each of the Eastern District of Virginia

1   cases -- namely, the Williams I, Galloway I, Williams II,

2   Galloway II, and Galloway III Cases -- the same United States

3   District Judge has been assigned.

4       In very general terms, in each of the Class Action Cases,

5   the Plaintiffs have brought claims individually and on behalf

6   of a purported class of similarly-situated individuals

7   against the respective Defendants therein for, among other

8   things, violation of various consumer lending protection laws

9   and the Racketeer Influenced and Corrupt Organizations Act,

10  or "RICO" for short.

11      In the Williams II Case, the Plaintiffs have brought

12  individual claims against the Defendants therein for

13  violations of the Fair Credit Reporting Act.

14      Again, in very general terms, the claims against

15  Martorello, the Debtor, and individuals and entities

16  affiliated with the Debtor are predicated on

17  "rent-a-tribe"-type allegations, effectively claiming that

18  such Defendants entered into agreements with the Tribal

19  Entities to use them as a vehicle to profit from usurious

20  loans made to consumers that are purportedly immune from

21  attack under tribal lending laws and the Tribal Entities'

22  sovereign immunity.

23      Indeed, in the Williams I Case, the first of the Class

24  Action Cases filed, the Tribal Entities sought the dismissal

25  of claims against them on the basis of tribal immunity.  In

1    June 2018, the District Judge denied the motion and the

2    Tribal Entities appealed.  *See* Consumer Borrowers' May 28

3    Hearing Exhibit 38, Docket Entries for Docket #124 and #135.

4        Leading up to and after the appeal, the parties were

5    embroiled in extensive and seemingly nasty discovery

6    disputes.  *See generally* Consumer Borrowers' May 28 Hearing

7    Exhibit 38.

8        Just a cursory review of the docket in the case reflects

9    the magnitude and expansiveness of the disputes.  While the

10   Tribal Entities and Martorello requested that the case be

11   stayed pending the outcome of the appeal, the Court denied

12   the request insofar as involving parties other than the

13   Tribal Entities and issues other than the sovereign immunity

14   issues on appeal.  *See, for example, id.*, Docket #323.

15       Separately, each of the Smith, Duggan, and Galloway III

16   Cases was initiated against, among others, various Tribal

17   Entities and/or individuals affiliated with the Tribal

18   Entities.

19       On June 7, 2019, the Plaintiffs in the Williams I and

20   Galloway I Cases filed a motion with the United States

21   Judicial Panel on Multi-District Litigation for the transfer

22   of, among other cases, the Smith and Duggan Cases to the U.S.

23   District Court for the Eastern District of Virginia for

24   centralized, consolidated pretrial proceedings.  The MDL

25   proceeding was assigned Case MDL No. 2906, which I'll refer

to as the "MDL Proceeding."

The Plaintiffs thereafter also added the Galloway III Case to the list.

On July 22, 2019, the Debtor, Martorello, and certain other individuals and entities affiliated with the Debtor filed their joint opposition to the motion. *See* Consumer Borrowers' May 28 Hearing Exhibit 40.

The principal basis for the opposition was the Respondents' assertion that the Plaintiffs had found a judge in the Eastern District of Virginia who is favorably disposed toward them, and thus that the request was nothing more than a "thinly-veiled exercise in forum shopping, nothing more." *See id.* at Page 2. *See also* Consumer Borrowers' May 28 Hearing Exhibit 41.

In the midst of this, on July 3, 2019, the Fourth Circuit Court of Appeals issued an opinion reversing the District Court's denial of the Tribal Entities' motion to dismiss in Williams I and remanding the case with instructions to grant the Tribal Entities' motion to dismiss for lack of subject matter jurisdiction on tribal immunity grounds. *See* Debtor's May 28 Hearing Exhibit 23.

While the Circuit Court's mandate was effective July 25, 2019, for reasons unknown to the Court, the District Court did not dismiss the Tribal Entities from the case at that time. *See* Consumer Borrowers' May 28 Hearing Exhibit 38.

1    Consequently, on August 12, 2019, the Tribal Entities

2    filed a motion for entry of judgment based upon the Fourth

3    Circuit's opinion.  *See id.*

4    However, again, for unknown reasons, the motion was not

5    immediately acted upon by the Williams I court, and, in fact,

6    would not be granted until February 18, 2020.

7    Separately, on September 19, 2019, the motion to transfer

8    in the MDL Proceeding was withdrawn and the MDL Proceeding

9    was closed.  *See* MDL Proceeding Docket #63 and #64.

10   Ultimately, a framework for a settlement among all the

11   Plaintiffs in the Consumer Borrower Cases, individually and

12   as representatives of the putative classes of similarly-

13   situated individuals that they represented, as applicable, on

14   the one hand, and the Tribal Entities, individuals affiliated

15   with the Tribal Entities, and certain others, including the

16   Settling Eventide Members, on the other hand, came together.

17   The tentative settlement was first announced to the

18   Williams I court on or about October 21, 2019.  *See* Consumer

19   Borrowers' May 28 Hearing Exhibit 38.

20   To effectuate the class settlement aspects of the

21   settlement, the settling parties needed all of the settling

22   parties and associated claims to be consolidated within one

23   action.  The parties selected Galloway III, which up to that

24   point in time had only been filed against various individuals

25   affiliated with the Tribal Entities, to serve as the

consolidated action.

Accordingly, on November 26, 2019, the Williams III --
I'm sorry -- the Galloway III Case Plaintiffs filed a motion
to amend their class action complaint to add the Plaintiffs
and Settling Defendants from all the other Consumer Borrower
Cases.  *See* Galloway III Case Docket #16 and #17.

On December 2, 2019, an order was entered granting the
motion, and the amended complaint was filed the next day. *See*
Galloway III Case Docket #20 and #23.

Not long after, the formal Class Action Settlement
Agreement and Release had been executed by all of the
Settling Parties, which I'll refer to as the "Settlement
Agreement."  *See* Consumer Borrowers' May 28 Hearing Exhibit
12.

E.   Prepetition Actions Taken by the Debtor in an Effort
to Prevent Consummation of the Settlement.

Under the terms of the settlement, subject to class
certification and approval of the class settlement, Big
Picture and Ascension are to (a) fund $8.7 million into the
settlement fund to be created; (b) collect no more than 2.5
times the original principal amount of any outstanding loans
owed by settling class members; and (c) cease efforts to
collect on charged-off loans owed by settling class members.

According to the Debtor, Components B and C equate to
roughly $11 million in value.  Thus, according to the Debtor,

consummation of the settlement could have a negative impact
of up to $20 million in relation to the Debtor's *de facto* net
profits interest under the Promissory Note.

Consequently, following announcement of the settlement,
the Debtor began to undertake multiple actions in an effort
to derail the settlement.  First, on December 16, 2019, the
Debtor commenced an action against each of the Tribal
Defendants, as well as the Tribe and TAC -- collectively, the
"Arbitral Defendants" -- before the American Arbitration
Association.  *See* Consumer Borrowers' May 28 Hearing Exhibit
13; Tribal Defendant's June 4 Hearing Exhibit 27.

Pursuant to the arbitration demand, the Debtor had
asserted claims for breach and anticipatory breach of the
LSA; breach and anticipatory breach of the Promissory Note;
breach of the Guaranty; breach of fiduciary duty; and request
for declaratory judgment relief determining the existence of
certain past defaults under the LSA and determining that the
Arbitral Defendants' execution of the Settlement Agreement
constitutes a default under the LSA.

Second, on December 17, 2019, the day after initiating
the arbitration, the Debtor filed a verified complaint for
injunctive relief against the Tribal Defendants in the United
States District Court for the Western District of Michigan.
*See* Tribal Defendants' June 4 Hearing Exhibit 33.  I'll refer
to this case as the "Michigan Injunction Case."

1     In the Michigan Injunction Case, the Debtor requested

2    entry of an injunction enjoining the Tribal Defendants from

3    entering into the Settlement Agreement.

4     Third, on December 18, 2019, the next day, the Debtor

5    filed a motion to intervene in the Galloway III Case.

6     None of these strategies proved to be sufficiently

7    expedient to the Debtor.  First, in the case of the

8    arbitration, while the Debtor has aggressively pursued

9    prosecution of the action, trial is not scheduled until late

10   July or early August 2020.

11    Second, in the case of the Michigan Injunction Case, the

12  Michigan District Court denied the Debtor's motion for a TRO,

13  determining, among other things, that "it is far from clear

14  that Plaintiff" -- referring to the Debtor -- "is likely to

15  prevail on the merits, given the very complicated financial

16  and legal set of circumstances between the parties," that

17  "[u]nder the complex circumstances presented, the assertions

18  of future irreparable harm are tenuous at best" and that the

19  Court was "not persuaded by Plaintiff's argument that public

20  policy strongly favors injunctive relief, given the policies

21  in favor of arbitration and the enforcement of contractual

22  agreements."  *See* Tribal Defendants' June 4 Hearing Exhibit

23  34.

24    In fact, as to the public policy point, the Court added

25  that "The public policy in favor of arbitration and

1   enforcement of contracts between sophisticated business

2   parties in the circumstances presented is far outweighed by

3   the public policy favoring the equitable and expeditious

4   settlement of mass consumer class action litigation." *See*

5   *id.* at Page 4.

6       Finally, with respect to the Debtor's motion to intervene

7   filed in Galloway III, to this day the Court has not ruled on

8   the motion.  In fact, notwithstanding the filing of the

9   motion on December 18, 2019, the Eastern District of Virginia

10  District Court entered a preliminary approval order as to the

11  Settlement Agreement on December 20, 2019.  *See* Debtor's May

12  28 Hearing Exhibit 50.

13      F.  The Litigation Heats Back Up Against Martorello, the

14  Debtor, and Other Affiliated Non-Settling Defendants.  The

15  Debtor Pivots to Bankruptcy.

16      On January 8, 2020, an identical order was entered in

17  each of the Williams I, Galloway I, and Galloway II Cases

18  lifting the stay of proceedings that had been ordered upon

19  the announcement of a settlement in principle and

20  establishing deadlines to "proceed expeditiously to resolve

21  the Plaintiff's claims against the Non-Settling Defendants."

22  *See* Consumer Borrowers' May 28 Hearing Exhibit 39.

23      Thus, in the face of both the Settlement Agreement and

24  the remaining litigation moving forward and the Michigan

25  District Court's denial of injunctive relief, on January 28,

1  2020, the Debtor initiated the Bankruptcy Case with the

2  filing of its voluntary petition for relief under Chapter 11

3  of the Bankruptcy Code.

4      While the bankruptcy filing had the effect of

5  automatically staying the Galloway II, Smith, and Duggan

6  Cases, it did not automatically stay Williams I, Galloway I,

7  Williams II, or, of most significance to the Debtor, Galloway

8  III.  Consequently, the very next day, on January 29, 2020,

9  the Debtor commenced Adversary 4008 to pursue injunctive

10 relief against both the Consumer Borrowers and the Tribal

11 Defendants under Sections 362 and 105 of the Bankruptcy Code.

12 *See* Adversary 4008 Docket #1.

13     In the Debtor's complaint, the Debtor defined the

14 "Pending Actions" as Williams I, Galloway I, Smith, Duggan,

15 Williams II, Galloway II, and Galloway III, and the Debtor

16 requests, pursuant to Bankruptcy Code Sections 362(a)(1) and

17 (a)(3), the issuance of declaratory relief to purportedly

18 stay the Consumer Borrowers from prosecuting any of their

19 claims in the Pending Actions until completion of the

20 Debtor's restructuring process, and pursuant to Bankruptcy

21 Code Section 105, the issuance of an injunction against all

22 parties barring the continued prosecution of the Pending

23 Actions until completion of the Debtor's restructuring

24 process.

25     On the same day as filing Adversary 4008, the Debtor also

1    filed a motion for preliminary declaratory and/or injunctive

2    relief.  *See* Adversary 4008 Docket #2.

3         G.   Other Activity in the Bankruptcy Case to Date.

4         For nearly a month, nothing took place in the Bankruptcy

5    Case outside of the previously-mentioned filing of Adversary

6    4008, the filing of a request for an extension of time to

7    file the Debtor's Schedules and Statement of Financial

8    Affairs, and the filing of applications to retain counsel.

9    *See generally* Debtor's May 28 Hearing Exhibit 5.

10        Meanwhile, outside of bankruptcy, on February 14, 2020,

11   in the case of the Smith and Duggan Cases, and on February

12   21, 2020 in the case of the Williams I and Galloway I Cases,

13   Martorello filed motions to transfer to the Northern District

14   of Texas based upon the existence of the Bankruptcy Case.

15   *See* Consumer Borrowers' May 28 Hearing Exhibits 35, 38, 43,

16   and 44.

17        Similarly, on February 21, 2020, Breakwater, Bluetech,

18   Gallant, and Justin and Rebecca Martorello also filed a

19   motion to transfer Galloway II to the Northern District of

20   Texas based upon the existence of the Bankruptcy Case.  *See*

21   Consumer Borrowers' May 28 Hearing Exhibit 36.

22        All of the motions to transfer venue filed in the Eastern

23   District of Virginia have been denied.  The motions in the

24   Districts of Oregon and Massachusetts remain pending.

25        Focusing back on the Bankruptcy Case, following the

1    United States Trustee's appointment of the Committee, which

2    Martorello has pejoratively referred to as a "pretend

3    committee," and the Committee's engagement of counsel, the

4    Debtor suddenly filed an emergency motion on February 26,

5    2020 for the entry of an order shortening the time within

6    which proofs of claim could be filed in the Bankruptcy Case

7    and permitting national notice by publication to be given of

8    the bar date, in light of the pending class actions.  *See*

9    Bankruptcy Case Docket #33.

10       In the words of the Debtor, "The purpose of this motion

11   is to shorten the time by which the Debtor can be confident

12   that all legitimate claims are accounted for and can

13   therefore propose a confirmable plan."  *See id.* at Page 4,

14   Paragraph 10.

15       Both the Committee and certain Consumer Borrowers

16   objected to the motion, raising concerns about the shortness

17   of time for the filing of proofs of claim proposed under the

18   motion, and, more significantly, the unspecified notice by

19   publication proposed.  *See* Bankruptcy Case Docket #40 and

20   #43.

21       Ultimately, the Court agreed to shorten the claims bar

22   date by a little bit to May 8, 2020, but denied the request

23   for approval of notice by publication without prejudice,

24   understanding that the Debtor would be submitting a

25   definitive proposal after further consultation with the

1  Committee.  *See* Bankruptcy Case Docket #68.

2      Ultimately, no request was ever made, and the potential

3  exists that there are putative class members with claims who

4  have not been provided notice of the claims bar date.

5      Separately, the Debtor also filed on February 26, 2020 an

6  application to employ McManigle of MACCO as Manager and Chief

7  Restructuring Officer of the Debtor, effective as of the

8  bankruptcy filing.  *See* Consumer Borrowers' May 28 Hearing

9  Exhibit 21.

10      Despite having no employees and no operations outside of

11  collecting funds under the Promissory Note and pursuing and

12  defending litigation, the Debtor explained that the Debtor

13  "came to the conclusion that it was critical to engage a

14  crisis management firm and a CRO to manage its business

15  through the restructuring process."  *See id.* at Page 3,

16  Paragraph 5.

17      McManigle's proposed role would include making

18  operational decisions, including those which will or

19  potentially will affect operations, contracting, accounting,

20  collection of accounts, cash and cash disbursements, and all

21  similar business undertakings; manage and control cash, cash

22  outflows, and financing commitments; negotiate with the

23  Debtor's creditors; evaluate and make recommendations and

24  decisions in connection with strategic alternatives to

25  maximize the value of the Debtor; and make any and all

business decisions on behalf of the Debtor, as necessary and required, utilizing the Manager's and CRO's business judgment. *See id.* at Pages 4-5.

On March 27, 2020, the Court entered an order authorizing the engagement. *See* Committee's May 28 Hearing Exhibit 3.

Despite McManigle's appointment as the Manager of the Debtor prior to the bankruptcy filing, despite the description provided to the Court in requesting approval of McManigle's postpetition engagement as Manager and CRO of the Debtor, and despite the promised independence and critical role that McManigle would play in connection with the case, the following is significant to note:

One.  McManigle never personally met with Martorello, the Debtor's president and only other officer, prior to his engagement.

Two.  Despite executing one of the prepetition unsecured Promissory Notes made payable to Bluetech, McManigle was not involved in any discussions or negotiations concerning the Promissory Note.

Three.  McManigle never spoke to any of the Debtor's members about the Chapter 11 filing prior to signing the bankruptcy petition.

Four.  McManigle's only communication with anyone employed by an entity in the chain of control of the Debtor has been with Tine Ponia, a purported authorized officer of

the offshore entity ATP Directors Limited, which manages,
directly or indirectly, Breakwater and Bluetech, both Cook
Islands entities.

Five.  McManigle has had no direct communications with
any representatives of the Tribe or the Tribal Defendants.

And six.  As of May 28, 2020, McManigle has never spoken
to Martorello directly and doesn't even know what he does for
the Debtor.

After obtaining a shortening of the claims bar date, the
Debtor was focused back on the Tribal Defendants, filing a
second lawsuit against them under Adversary Proceeding No.
20-4014, which I'll refer to as "Adversary 4014."  Pursuant
to the complaint in Adversary 4014, and despite the pendency
of the arbitration involving breach of contract claims
between the parties, which the Debtor was and is continuing
to actively prosecute, the Debtor sought to compel the Tribal
Defendants to make payments under the Promissory Note via
turnover relief under Bankruptcy Code Section 542.

Similar to Adversary 4008, the Debtor also sought
emergency preliminary injunctive relief in an effort to
effectively prevent the Tribal Defendants from consummating
the Settlement Agreement pending the outcome of the
arbitration.

Ultimately, the Court dismissed the claims asserted
against the Tribal Defendants in both Adversary 4008 and

Adversary 4014 for want of jurisdiction on tribal immunity

grounds.  *See* Tribal Defendants' June 4 Hearing Exhibits 35

and 36.

On April 24, 2020, the day after the Consumer Borrowers

filed the Bankruptcy Dismissal Motion, the Debtor filed yet

another lawsuit against the Tribal Defendants, this time

under Adversary 4030.  The complaint in Adversary 4030

asserts claims of breach of contract largely mirroring

assertions currently being litigated in the pending

arbitration and seeking preliminary injunctive relief to both

compel payments under the Promissory Note and prevent

consummation of the Settlement Agreement pending conclusion

of the arbitration.

On May 15, 2020, the Debtor filed a motion for an

extension of the exclusivity periods of Bankruptcy Code

Section 1121 for the filing of a Chapter 11 plan and

obtaining confirmation of the plan.  *See* Bankruptcy Case

Docket #152.

Pursuant to the motion, the Debtor claims that an

extension is warranted and appropriate because a decision in

the arbitration is not expected to be issued until mid-

September 2020, and according to the Debtor, if the Debtor is

successful in obtaining an award, the award will allegedly

provide the Debtor with the information that it needs to

project recoveries to legitimate creditors in the case.  *See*

1    *id.* at Page 2.

2      On the same date, the Debtor filed the Financing Motion

3 to request authority to obtain postpetition financing in the

4 amount of $2 million from Bluetech, the indirect 59.5 percent

5 owner of the Debtor through Breakwater and the entity in sole

6 control of the Debtor through Breakwater as the Debtor's one

7 hundred percent voting member.  The financing is proposed to

8 be used almost exclusively if not exclusively for the payment

9 of professional fees and expenses, particularly litigation

10 fees and expenses.

11      Despite Bluetech's prepetition agreement to provide $1.25

12 million in financing to the Debtor on an unsecured basis at a

13 maximum non-default interest rate of three percent per annum,

14 *see* Committee's May 28 Hearing Exhibits 4 and 5, pursuant to

15 the Financing Motion, as amended, the terms of the financing

16 would include:  (1) a $150,000 origination fee payable to

17 Bluetech; (2) a $200,000 exit fee payable to Bluetech; (3) a

18 success fee of two percent of "any settlement or award at the

19 arbitration;" (4) interest on the outstanding principal

20 balance at 12 percent per annum; (5) the payment of all

21 actual out-of-pocket expenses of Bluetech; (6) security in

22 the form of a lien in all assets of the Debtor and proceeds

23 thereof, with the exception of Chapter 5 claims; (7) a

24 maturity of the earliest of one year, consummation of a sale

25 of all or any portion of the Debtor's assets, the effective

date of a plan, dismissal of the Bankruptcy Case, or the date of termination of the DIP loan commitments and acceleration under the DIP financing agreement; and (8) the acknowledgement that Bluetech has not and is not subjecting itself to the jurisdiction of this Court in the event of any disputes or otherwise.

Of note, McManigle never communicated with Bluetech, its trustee, the Guardian Trust Corporation, or anyone else on behalf of the DIP Lender with respect to the DIP financing, McManigle was not involved in any negotiations with respect to the terms of the DIP loan, and McManigle was totally unaware of Bluetech's refusal to submit to the jurisdiction of the Court until it was pointed out by the Committee's counsel. *See also* Bankruptcy Case Docket #85, Bluetech's Objection to the Committee's Motion for a Bankruptcy Rule 2004 Examination of Bluetech, on the basis of, among other things, lack of personal jurisdiction, noting that the Cook Islands are not party to the Hague Convention.

Even more troubling, in connection with the Financing Motion hearing, no evidence was presented of any negotiation at all with Bluetech with respect to the terms of the DIP financing.

H.   The Debtor's Assets and Claims Asserted in the Case.

Turning next to the Debtor's assets and liabilities, as of the date of the bankruptcy filing, the Debtor scheduled

assets with a value of $60,437,205.34 and total claims of
$7,643,567.14.  *See* Consumer Borrowers' May 28 Hearing
Exhibit 17 at Page 9.

On the asset side of the equation, the Debtor has
assigned a value of $60,180,386.87 to the Promissory Note and
amounts payable thereunder, the Debtor's primary asset.
Scheduled claims are for the $1.25 million in prepetition
unsecured loans made by Bluetech to the Debtor; unpaid fees
and expenses of counsel; a disputed claim of nearly $4.575
million to TED associated with advance Promissory Note
payments made by TED to the Debtor prepetition; a $115,000
claim of Liont; and a few nominal claims of third parties.

Turning to filed proofs of claim, 36 Consumer Borrowers
or other borrowers or putative class members have filed
proofs of claim, aggregating roughly $100,000.  All or
substantially all of the claims, however, also reference one
or more of the class action cases and reference class claims
in an unliquidated amount to be determined.  *See generally*
Bankruptcy Case Claims Register.  *See also* Consumer
Borrowers' May 28 Hearing Exhibit 23.

Separately, unliquidated claims have also been filed by
Gallant, Liont, Martorello, Justin and Rebecca Martorello,
and Dowd, in each case predicated on the indemnity provisions
of the Debtor's operating agreement.  The IRS has filed a
claim for $400.  And the law firm of Armstrong Teasdale has

1   filed a claim for $2,719,064.

2        Beginning on May 27, 2020, the day before the hearing on

3   the Consumer Borrowers' Bankruptcy Dismissal Motion, and

4   continuing into May 28, 2020, objections to each of the

5   Consumer Borrower proofs of claim were filed by the Debtor

6   and Martorello.  Each of the objections of the Debtor and

7   Martorello, respectively, are substantially identical in

8   content.  *See* Bankruptcy Case Docket #180, #183-185, #187-

9   206, and #208-255.

10        Of note, neither McManigle nor anyone else at MACCO

11   reviewed or undertook any analysis of any of the proofs of

12   claim objected to prior to the filing of the claims

13   objections.

14        Discussion.

15        A.  Statutory Grounds and the Parties' Respective

16   Positions.

17        Dismissal in Chapter 11 is governed by Section 1112 of

18   the Bankruptcy Code.  In particular, Section 1112(b)(1)

19   provides, in relevant part:  On request of a party in

20   interest, and after notice and a hearing, the Court shall

21   convert a case under this chapter to a case under Chapter 7,

22   or dismiss a case under this chapter, whichever is in the

23   best interest of creditors and the estate, for cause, unless

24   the Court determines that the appointment under Section

25   1104(a) of a trustee or an examiner is in the best interests

1   of creditors and the estate.  *See* 11 U.S.C. Section

2   1112(b)(1).

3       Here, the Consumer Borrowers assert that cause exists for

4   dismissal of the Bankruptcy Case under Section 1112(b)(1)

5   based upon the Debtor's alleged lack of good faith in

6   commencing the Bankruptcy Case.  In particular, the Consumer

7   Borrowers argue that the Debtor has simply attempted to

8   utilize the Bankruptcy Code as a litigation tactic and/or to

9   forum shop, with no true objective to reorganize.

10      The Consumer Borrowers also rely upon the factors

11  identified by the Fifth Circuit in *Little Creek Development*

12  *Company v. Commonwealth Mortgage Corp. (In re Little Creek*

13  *Development Company)*, 779 F.2d 1068 (5th Cir. 1986) for

14  indicia of bad faith.

15      Alternatively, the Consumer Borrowers request suspension

16  of the Bankruptcy Case on abstention grounds, whereby the

17  Consumer Borrowers are permitted to liquidate their claims by

18  trying one or more so-called bellwether cases in the Eastern

19  District of Virginia.

20      Suspension of a Bankruptcy Case on abstention grounds is

21  governed by Section 305 of the Bankruptcy Code.  Section 305

22  provides, in relevant part, "The Court, after notice and a

23  hearing, may suspend all proceedings in a case under this

24  title at any time if the interests of creditors and the

25  debtor would be better served by such suspension."  *See* 11

1   U.S.C. Section 305(a)(1).

2       The Committee has joined the Consumer Borrowers in

3   requesting the alternative relief of suspension of the

4   Bankruptcy Case until the Consumer Borrower cases have been

5   resolved and the Consumer Borrowers' claims against the

6   Debtor have been liquidated.  At hearing, however, the

7   Committee seemed to also join in the Consumer Borrowers'

8   request for dismissal.

9       The Debtor responds that in order for the Consumer

10  Borrowers to succeed on their request for dismissal, they

11  must establish that the Bankruptcy Case was not filed for any

12  valid bankruptcy purpose, and the Debtor asserts that the

13  Consumer Borrowers cannot carry that burden because the

14  Bankruptcy Case was filed for two valid bankruptcy purposes:

15  First, to preserve the value of the Promissory Note; and

16  second, to reduce the duplicative and excessive costs and

17  distractions of defending litigation in multiple forums.

18      The Debtor asserts that suspension of the Bankruptcy Case

19  on abstention grounds would present an even worse outcome for

20  all parties because it would severely burden the estate in

21  its the ability to pay creditors on account of the

22  duplicative adjudication of identical claims.

23      Martorello has joined in the Debtor's opposition and

24  separately filed a response to the Committee's statement of

25  position, asserting that the Committee is an illegitimate

puppet committee comprised of plaintiffs in litigation who are not focused on attempting to maximize payment to unsecured creditors.

B.   Dismissal for Lack of Good Faith.

In *Little Creek*, the Fifth Circuit reiterated the longstanding principle that bankruptcy relief, as an equitable remedy, is dependent upon a debtor's good faith in commencing and prosecuting the case.  The Court explained, "Every bankruptcy statute since 1898 has incorporated literally or by judicial interpretation a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.  Such a standard furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy.  Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes.  Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons available only to those debtors and creditors with 'clean hands.'" *Little Creek*, 779 F.2d at 1071-72, citations omitted.

As such, courts have recognized that a debtor's lack of

good faith constitutes cause for dismissal under Section
1112(b) of the Bankruptcy Code. *See id.* at 1072. *See also
Humble Place Joint Venture v. Fory (In re Humble Place Joint
Venture)*, 936 F.2d 814, 816-17 (5th Cir. 1991).

Lack of good faith is to be determined based upon the
totality of the circumstances. *See In re Mirant Corp.*, No.
03-46590, 2005 WL 2148362, *6 (Bankr. N.D. Tex. January 26,
2005).

As explained by the Fifth Circuit, "Determining whether
the debtor's filing for relief is in good faith depends
largely upon the bankruptcy court's on-the-spot evaluation of
the debtor's financial condition, motives, and the local
financial realities." *Little Creek*, 779 F.2d at 1072. *See
also Mirant Corp.*, 2005 WL 2148362, *6.

As such, findings of lack of good faith are most often
predicated on a conglomerate of factors rather than any one
particular data point. *Little Creek*, 779 F.2d at 1072. *See
also In re Carbaugh*, 299 B.R. 395, 399 (Bankr. N.D. Tex.
2003).

In *Little Creek*, for example, the Fifth Circuit explained
that several -- but not necessarily all -- of the following
conditions usually exist in a single-asset real estate case
pursued in bad faith:  (1) there are generally no employees
except for the principals; (2) there is little or no cash
flow; (3) there is no available sources of income to sustain

1  a plan of reorganization; (4) there are typically only a few,

2  if any, unsecured creditors, whose claims are relatively

3  small; (5) the property of the debtor has usually been posted

4  for foreclosure because of arrearages and the debtor has been

5  unsuccessful in defending actions against foreclosure in

6  state court; and (6) there are sometimes allegations of

7  wrongdoing by the debtor or its principals.

8      In *Mirant*, Judge Lynn opined that courts may find more

9  useful the "valid bankruptcy purpose" test to determine good

10 faith.  *See Mirant Corp.*, 2005 WL 2148362, *7.

11     He quoted the *Integrated Telecom Express* case out of the

12 Third Circuit for the proposition that valid bankruptcy

13 purposes may include, for example, preserving going concerns

14 and maximizing property available to satisfy creditors.  *See*

15 *id.*

16     In any dismissal proceeding, the proponent of dismissal

17 must carry the initial burden, placing into question the

18 debtor's good faith.  If satisfied, then the burden then

19 shifts to the debtor to show that it acted in good faith and

20 is acting in good faith -- *i.e.*, has a valid purpose in

21 filing the Bankruptcy Case and prosecuting the Bankruptcy

22 Case.  *See id.  See also Carbaugh*, 299 B.R. at 399, citing *In*

23 *re Tamecki*, 229 F.3d 205, 207 (3rd Cir. 2000).

24     Here, based upon a totality of the circumstances, the

25 Court finds that the Debtor has not filed and prosecuted the

1  Bankruptcy Case in good faith, as evidenced by the following:

2  First, the Debtor is not an operating business.  It is a

3  holding company with no employees that for all practical

4  purposes owns a single asset, the Promissory Note.  Thus,

5  there is no true going concern operation to preserve.

6      Second, the Bankruptcy Case was clearly filed as the next

7  step in a strategy to try to find a court willing to

8  temporarily or permanently prevent the Tribal Defendants from

9  consummating the Settlement Agreement.  In this regard,

10  having already commenced the arbitration, which has the

11  ability to determine all contractual claims between the

12  parties, and after having failed to obtain injunctive relief

13  from the Michigan District Court, and failed to obtain

14  intervention in the Galloway III case, the Debtor has

15  resorted to bankruptcy with the tortured objective of trying

16  to shoehorn adversary proceeding claims into the narrow

17  jurisdictional provisions of the LSA, wholly ignoring the

18  material adverse effect and status quo limitations of the

19  LSA.

20      And contrary to the Debtor's arguments of filing the

21  Bankruptcy Case to stop the bleeding and preserve value, the

22  Bankruptcy Case has been nothing but bleeding, with the

23  Debtor having already incurred upwards of $800,000 in

24  professional fees, predominantly in litigation in three

25  different adversary proceedings that is duplicative of the

arbitration in the case of the Tribal Defendants and which

has, in any event, netted zero beneficial results for the

estate.

    While a legitimate Chapter 11 proceeding may present new

litigation strategies that do not otherwise exist outside of

bankruptcy, Congress did not intend for Chapter 11 itself to

be a litigation strategy.  *See, for example, Mirant*, 2005 WL

2148362, *8, noting that, "In analyzing the purpose of a

debtor's Chapter 11 petition in the context of a motion to

dismiss for bad faith filing, the courts regularly consider

whether the bankruptcy was intended to obtain tactical

advantage in litigation or negotiations."

    Third, the Bankruptcy Case was also clearly filed as the

next step in a strategy to try to assist Martorello and

individuals and entities affiliated with Martorello in

finding a way to forum shop away from the District Court in

the Eastern District of Virginia that, for reasons that are

not necessary for the Court to fully comprehend, appears to

be a less than -- the Court, that for reasons that are not

necessarily clear to this Court, appears to be less than

impressed with the positions taken by Martorello in the

litigation.

    That was very tortured.  Let me say that again.  Third,

the Bankruptcy Case was also clearly filed as the next step

in a strategy to try to assist Martorello and individuals and

1   entities affiliated with Martorello in finding a way to forum

2   shop away from the District Court in the Eastern District of

3   Virginia that, for reasons that are not necessary for this

4   Court to fully comprehend, appears to be less than impressed

5   with the positions taken by Martorello in the litigation.

6       Fourth, while I wholeheartedly agree with Debtor's

7   counsel's argument that bankruptcy may legitimately serve the

8   purpose of consolidating splintered litigation among multiple

9   courts and/or cases for the purpose of facilitating

10  constructive negotiations towards a cost-effective resolution

11  and/or a restructuring, the Debtor's and Martorello's actions

12  during the course of the Bankruptcy Case have been about as

13  antithetical to such objectives as you can get.

14      Initially, while giving lip service to the concept of

15  developing publication noticing protocol designed to notify

16  all potential claimants of the Bankruptcy Case and claims bar

17  date so as to bring all potential consumer borrower claimants

18  into a centralized forum, no action was ever taken, raising

19  potentially serious questions with respect to the

20  effectiveness of any discharge that might be obtained under a

21  confirmed Chapter 11 plan, given the limited level of notice

22  provided to creditors and potential creditors.

23      Nevertheless, putting that concern aside, and more

24  significantly, instead of seeking to openly communicate with

25  the Committee and work towards a potential global resolution,

or at least an agreed-upon protocol that would consolidate

particular issues for resolution in relation to the proofs of

claim that have been filed, Martorello has effectively

resorted to name-calling, and the Debtor, through counsel,

surprisingly and brazenly stated that, to the extent any of

the Consumer Borrowers are ever found to hold any legitimate

allowed claims against the Debtor, the Debtor will simply

separately classify them, apparently previewing the Debtor's

intent to gerrymander a vote on a plan in such instance.

Fifth, the Debtor's actions are not being taken under the

direction and control of McManigle as the Debtor's

independent Manager and CRO.  Instead, it is clear that the

Cook Islands entity Breakwater, as the one hundred percent

voting member of the Debtor, which in turn is wholly owned by

the Cook Islands entity Bluetech, is directing the actions of

the Debtor, to the exclusion of McManigle.

This is evident by virtue of the fact that McManigle had

zero involvement in reviewing the proofs of claim that have

been objected to, zero involvement in any discussions or

negotiations with any of the Tribal Defendants, and perhaps

most shockingly, zero involvement in any discussions or

negotiations with Bluetech as the proposed DIP Lender, who

astoundingly seeks to leverage the Bankruptcy Case to its

benefit while at the same time thumbing its nose at the

concept of subjecting itself to the jurisdiction of this

1    Court in connection with administering the proposed DIP loan.

2        Finally, this is not a case where there is a lack of

3    financial wherewithal to address liabilities.  The Debtor has

4    scheduled the Promissory Note as having a value in excess of

5    $60 million.  And importantly, the Tribal Defendants have

6    never taken the position that the LSA and Promissory Note are

7    not enforceable.  They have simply taken the position that no

8    payments are owing under the Promissory Note until the

9    amounts that were previously advanced under the Promissory

10   Note are recouped.

11       Moreover, to the extent that the Debtor is in need of

12   funding to preserve the value of the Promissory Note for the

13   benefit of its owners, it need look no further than Bluetech

14   and Gallant, who collectively received distributions in

15   excess of $13.6 million within the two years preceding the

16   bankruptcy filing.  *See* Consumer Borrowers' May 28 Hearing

17   Exhibit 18 at Pages 11-13.

18       As a result of the Debtor's lack of good faith in filing

19   and prosecuting the Bankruptcy Case, the Court finds that

20   cause exists for dismissal of the Bankruptcy Case under

21   Section 1112(b)(1) of the Bankruptcy Code.

22       The Court notes that in reviewing the provisions of

23   Section 1112(b)(1), the Court also considered whether the

24   alternative appointment of a trustee or examiner would be in

25   the best interests of creditors and the estate.  While in

1  certain respects the Court found the possibility of an

2  independent trustee to be appealing, the Court nevertheless

3  determined that dismissal was in the best interests of

4  creditors and the estate for two reasons.

5      First, the Consumer Borrowers, being by far and away the

6  vast majority of the creditors in the case, have clearly

7  requested dismissal, even in the face of the comments that

8  the Court made regarding the benefits of Chapter 5 claims in

9  bankruptcy.

10     Second, the Court has concern that the appointment of a

11 trustee could present complications in relation to the

12 Debtor's preparation and prosecution of the upcoming

13 arbitration.  Therefore, for this additional reason, the

14 Court has found dismissal to be warranted.

15     As a result of the foregoing, the Court now also focuses

16 on the other pending matters.  First, with respect to the

17 Financing Motion, the Court denies the motion as moot.

18     That said, even if the Bankruptcy Case were not

19 dismissed, the Court cannot envision any circumstance under

20 which it would approve DIP financing for litigation costs

21 from an insider who refuses to subject itself to the

22 jurisdiction of the Court on the type of terms proposed.

23     Next, with respect to both the Adversary 4008 Dismissal

24 Motion and the Adversary 4030 Dismissal Motion, inasmuch as

25 both motions are predicated on the existence of bankruptcy

1   jurisdiction and both cases have not progressed beyond the

2   dismissal motion stage, the Court finds that both cases

3   should be dismissed without prejudice under the Fifth Circuit

4   authority of *Querner v. Querner (In re Querner)*, 7 F.3d 1199

5   (5th Cir. 1993).

6        All right.  That concludes the Court's ruling.

7        Mr. Muenker, if I can look to you to submit a proposed

8   form of order on the Bankruptcy Dismissal Motion and also on

9   the Financing Motion.  Are you still there?

10        MR. NELIGAN:  Your Honor, this is Pat Neligan.  We

11   will get you the order for both.

12        THE COURT:  All right.  Very good.  So if I can --

13        MR. MUENKER:  Your Honor, I'm sorry.  I had you on

14   mute.  I'm still here.  I was talking and couldn't figure out

15   why no one could hear me.

16        THE COURT:  No problem.  All right.  So if I can look

17   to you all to prepare orders on those matters, obviously,

18   circulating them to all of the parties who are represented on

19   the phone today.  And if you'll also take care of preparing a

20   form of dismissal order without prejudice in the 4008

21   adversary.

22        Mr. Drake, if I can look to you and your colleagues to

23   prepare a proposed form of order for dismissal without

24   prejudice of Adversary 4030 -- again, similarly, circulating

25   it counsel for the Debtor, at a minimum, and I'd probably go

1   ahead and why don't you circulate that also to Mr. Phelan and

2   the Committee, Mr. Leibowitz for the Committee.

3          MR. DRAKE:  Yes, Your Honor, this is Scott Drake.

4   We'll take care of that.

5          THE COURT:  All right.  That concludes the matters on

6   the --

7          MS. SCHMIDT:  Your Honor?

8          THE COURT:  -- 9:30 a.m. docket.  Are there any other

9   issues that need to be taken up?

10         MS. SCHMIDT:  Your Honor, Erin Schmidt with the U.S.

11   Trustee's Office.  The U.S. Trustee had asked me to, if the

12   Court had been inclined to dismiss this case, would the Court

13   consider language in a dismissal order in which the Court

14   would retain jurisdiction over fees and directing

15   professionals to file fee applications within a date certain?

16         MR. PROSTOK:  I mean, Your Honor, this is the Debtor.

17   If the case is dismissed, there's no reason to have a fee app

18   hearing.  I mean, I --

19         MS. SCHMIDT:  Your Honor, --

20         THE COURT:  Go ahead, Ms. Schmidt.

21         MS. SCHMIDT:  Your Honor, if I can respond to that.

22         THE COURT:  Okay.

23         MS. SCHMIDT:  Given the Court's ruling that indicates

24   that there might have been possible conflicts of interest, we

25   just thought it was appropriate that -- it may be appropriate

1    for the Court to retain jurisdiction over fees, to determine

2    whether professionals might have been conflicted during their

3    representation of the Debtor.

4            MR. PROSTOK:  Well, Your Honor, --

5            THE COURT:  All right.  Well, why don't we do this.

6    Why don't we, rather than making a call on this on the fly, I

7    would be interested in seeing any authority that you all

8    respectively may have on the appropriateness of retention of

9    jurisdiction in a circumstance like this.

10        So, if I can -- Ms. Schmidt, if I can look to you to

11    submit something prior to 14 days after the entry of the

12    dismissal order, to the extent that the U.S. Trustee wishes

13    for jurisdiction to be retained on a limited basis for the

14    purposes that you outlined, and then the Debtor and any other

15    parties in interest would have an opportunity to respond to

16    that, and then I'll try to get that knocked out quickly so

17    that things can move on.

18            MS. SCHMIDT:  I appreciate that, Your Honor.  Thank

19    you.

20            THE COURT:  All right.  Very good.  That concludes

21    the matters on the 9:30 a.m. docket.  The Court will be in

22    recess.

23        (Proceedings concluded at 11:03 a.m.)

24                            --oOo--

25    ///

CERTIFICATE

1

2     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
3     above-entitled matter.

4        **/s/ Kathy Rehling**                              **06/12/2020**

5     _____        _____

6     Kathy Rehling, CETD-444                                    Date
Certified Electronic Court Transcriber

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

62

INDEX

PROCEEDINGS                                                          4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                             4

END OF PROCEEDINGS                                                 60

INDEX                                                              62